IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 16-07690 (ESL) |
| PJ ROSALY ENTERPRISES INC. | CHAPTER 11 |
| Debtor | |

OPINION AND ORDER

This case is before the court upon the Debtor's *Motion Requesting Rejection of Collective Bargaining Agreement with Union de Tronquistas* (Docket No. 152) and the Union de Tronquistas de Puerto Rico's (hereinafter referred to as the "Union") *Opposition to Debtor's Motion for Rejection of Collective Bargaining Agreement Under 11 U.S.C. §1113* (Docket No. 154).

Procedural Background

On September 28, 2016, the Debtor filed a voluntary petition in the bankruptcy court for the District of Puerto Rico under the provisions of chapter 11 of the Bankruptcy Code. (Docket No. 1). On May 2, 2017, the Debtor filed the *Motion Requesting Rejection of Collective Bargaining Agreement with Union de Tronquistas* (Docket No. 152). On May 8, 2017, the Union filed its *Opposition to Debtor's Motion for Rejection of Collective Bargaining Agreement Under 11 U.S.C. §1113* (Docket No. 154). On May 25, 2017, the court entered an *Order* scheduling a hearing for July 27, 2017 (Docket No. 164).

On June 2, 2017, the Debtor filed a *Motion Requesting Continuance of Hearing* (Docket No. 168) requesting that the same be continued to August 3, 2017, as its accountant would not be available to testify on July 27, 2017. The *Motion Requesting Continuance of Hearing* (Docket No. 168) was granted on June 5, 2017 (Docket No. 169). Thereafter, the parties submitted their witness and exhibit lists. See Dockets Nos. 191, 192 and 193.

-1-

On August 3, 2017, the court held a hearing during which the parties agreed to the following time table: "(1) the Union will provide the debtors within five (5) days a list of the information needed; (2) the debtors will provide to the Union the information requested within (5) days; (3) the Union will review the information within five (5) days and five (5) days thereafter will submit to the debtors a counter-offer; (4) the debtors will respond to the counter-offer within (5) days; (5) If no agreement is reached, the parties will meet and then inform the court on status of contested matters and proposed action, including the appointment of a mediator." See *Minute Entry*, Docket No. 202 and *Audio File*, Docket No. 203. In addition, the parties requested a hearing within forty-five days and the court scheduled the same for September 27 and September 28, 2017.

On September 1, 2017, both parties filed motions related to discovery disputes. See Dockets Nos. 213 and 214.  On September 12, 2017, the court entered an *Order* (Docket No. 217) scheduling a hearing to consider the discovery disputes for September 22, 2017. However, nature intervened and due to the passage of Hurricane Irma and then Hurricane Maria, all hearings had to be continued. See Dockets Nos. 221 and 224. The hearing was continued to November 8 and 9, 2017. See Docket No. 224.

On November 3, 2017, the parties filed a *Motion to Inform Pending Matters for Hearing Scheduled on November 8 and 9 2017 Including Relevant Docket Entries* indicating that no agreement had been reached. See Docket No. 227. On November 8 and 9, 2017, the court held an evidentiary hearing during which the parties argued their positions before the court and submitted their evidence. See *Minute Entries*, Docket Nos. 231 and 232, and *Audio File* Docket Nos. 228 and 229.  The matter was taken under advisement. This decision is being rendered within thirty

(30) days after the date of the commencement of the hearing in compliance with Section 1113(d)(2)[1].

Jurisdiction

The court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (O).

Facts and Positions of the Parties

*Facts*

The Debtor provides carrier services to its clients. Its services are complemented by the services of two related entities: Islandwide Logistics, Inc. and HME Holdings, Inc. These two entities also filed for bankruptcy. See Cases Nos. 16-07686 and 16-07693. On April 27, 2017, the three debtor entities filed a *Joint Disclosure Statement and Plan of Reorganization*. See Docket Nos. 109 and 110 in Case No. 16-07686; Docket Nos. 106 and 107 in Case No. 16-07693; and Dockets Nos. 148, 149, 200 and 212 in the instant case.

The Debtor and the Union signed a *Collective Bargaining Agreement* on October 1, 2012. The same was effective until September 30, 2017. See Exhibit A of Docket No. 154. This agreement was later modified through a *Stipulation* signed on August 24, 2016. See Exhibit B of Docket No. 154. The *Stipulation* altered several of the clauses contained in the 2012 collective bargaining agreement and extended its effectiveness until September 30, 2019. The Debtor filed for bankruptcy on September 28, 2016, one month after the *Stipulation* was signed.

The *Collective Bargaining Agreement* signed on 2012, in conjunction with the *Stipulation* signed on August 24, 2016, constitute the collective bargaining agreement which the Debtor is seeking to reject. The court will refer to this as the "CBA" for purposes of this opinion and order.

---

[1] "The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to." 11 U.S.C. § 1113(d)(2).

The *Joint Disclosure Statement and Plan of Reorganization* filed by the three related entities and the projections included therein assume that the CBA will be rejected. See Exhibit 4 of Docket No. 148.

*Debtor's Position*

The Debtor sustains that it cannot afford the cost of the CBA as is. It alleges that the clauses it is seeking to modify have an economic impact of approximately $582,503 per year. Moreover, the Debtor argues that it will not be able to reorganize if the court does not approve the rejection of the CBA, nor will the other two related entities.

Furthermore, the Debtor concludes that it has complied with the provisions of Section 1113, and that the Union has refused to accept its proposals without just cause.

*Union's Position*

The Union does not dispute that the Debtor and the Union met and tried to reach an agreement. However, it argues that the Debtor has failed to comply with the requirements of Section 1113. For example, the Union sustains that the Debtor has failed to provide sufficient financial information. Likewise, the Union argues that the Debtor failed to negotiate in good faith.

Moreover, the Union argues that the filing of the bankruptcy petition one month after the *Stipulation* was signed is evidence of bad faith. The Union sustains that it made substantial concessions during the August 2016 negotiations. In addition, the Union argues that it had good cause to reject the Debtor's proposal and that the balance of the equities does not favor rejection.

*Controversy before the court*

The issue before the court is whether the Debtor's request to reject the CBA complies with the provisions of Section 1113. The court is cognizant of the importance and impact of its decision. Especially, in light of the economic conditions in Puerto Rico for the past decade, as amplified by the passage of Hurricanes Irma and Maria. The court is also keenly aware of the fact that the *Stipulation* between the Union and the Debtor was signed on August 24, 2016, one month before the bankruptcy petition was filed. This sequence of events seems to have had a severe impact on the positions and negotiations between the parties.

Nevertheless, this court's decision must be based on the applicable law and facts. Accordingly, the court will proceed to determine whether the Debtor has complied with the requirements of Section 1113.

Applicable Law and Analysis

*Rejection of a Collective Bargaining Agreement under Section 1113*

**A. Overview of Section 1113**

Rejection of a collective bargaining agreement is governed by Section 1113 which provides in part that:

> (c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that--
> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
> (2) the authorized representative of the employees has refused to accept such proposal without good cause; and
> (3) the balance of the equities clearly favors rejection of such agreement

11 U.S.C. § 1113(c).

Accordingly, the Debtor must comply with the requirements of Section 1113(b)(1) which provides:

> Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall--
> (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
> (B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

11 U.S.C. § 1113(b)(1).

Finally, subsection 1113(b)(2) establishes that:

> During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative

to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

11 U.S.C. § 1113(b)(2).

Section 1113 was enacted "rather hurriedly in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*." Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1113.01(16th ed. 2015). In Bildisco, the Supreme Court held that collective bargaining agreements could be rejected pursuant to Section 365 "if the debtor can show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 526, 104 S. Ct. 1188, 1196, 79 L. Ed. 2d 482 (1984). The court also held that a debtor's unilateral modification or rejection of the collective bargaining agreement before court approval of the rejection was not an unfair labor practice under the National Labor Relations Act. Id. at 534.  Therefore, "with § 1113, Congress clearly manifested its intent that CBAs be treated differently than other executory contracts with respect to rejection." In re Family Snacks, Inc., 257 B.R. 884, 890 (B.A.P. 8th Cir. 2001).

Following the enactment of Section 1113, several courts have followed the nine-factor test first articulated in In re Am. Provision Co., 44 B.R. 907, 909 (Bankr. D. Minn. 1984), to determine whether the debtor complied with Section 1113. The Court summarized the requirements contained in Section 1113 as follows:

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

Id.

However, there is disagreement among the courts in the application and interpretation of the specific factors. The Bankruptcy Appellate Panel for the Eight Circuit has noted this lack of consensus declaring that "Section 1113 is certainly not a masterpiece of draftsmanship. Courts and scholars alike have commented extensively on how poorly-drafted this statutory provision is." In re Family Snacks, Inc., 257 B.R. at 891 (internal quotations omitted), quoting In re American Provision, 44 B.R. at 909; see also In re Delta Air Lines, 342 B.R. 685, 691 (Bankr. S.D.N.Y. 2006) ("Section 1113 must surely be one of the most unusual provisions in the Bankruptcy Code or any other statute because of the remarkable degree of subjective discretion which a bankruptcy court must exercise in order to carry out its mandate. The italicized words and phrases in the foregoing quotation (viz., "necessary" (twice); "fairly and equitably"; "good faith"; "good cause"; "balance of the equities") admit of no precise meaning in common parlance."); Daniel Keating, The Continuing Puzzle of Collective Bargaining Agreements in Bankruptcy, 35 Wm. & Mary L. Rev. 503, 506 (1994) ("After nearly a decade and dozens of cases, the debate concerning section 1113 is far from settled. Neither the courts nor scholars can agree about what Congress intended

-7-

to accomplish with section 1113. Similarly, courts still have not arrived at a consensus concerning how they ought to interpret that section's nebulous standards for allowing a Chapter 11 company's rejection of a collective bargaining agreement.").

The court will apply the nine factor test, which incorporates the provisions of Section 1113, to determine whether the Debtor complied with Section 1113[2].

**B. Burden of Proof**

"The Trustee generally bears the burden of proof, by a preponderance of the evidence on each of the elements of section 1113." Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1113.05[1] (16th ed. 2015); In re AMR Corp., 477 B.R. 384, 406 (Bankr. S.D.N.Y. 2012) ("The Debtor bears the burden of proof by the preponderance of the evidence on the elements of Section 1113.").

Some courts have held that "[a]s a practical matter, once the debtors have made their prima facie case, the burden shifts to the union to show that the debtor did not supply sufficient information, that the debtor did not bargain in good faith in addition to demonstrating that the union had good cause to refuse the proposal." In re Patriot Coal Corp., 493 B.R. 65, 112 (Bankr. E.D. Mo. 2013); In re Bowen Enterprises, Inc., 196 B.R. 734, 741 (Bankr. W.D. Pa. 1996) ("Debtor bears the ultimate burden of persuasion, by a preponderance of the evidence, as to all of these requirements. This does not, however, mean that the burden of production is upon debtor in every

---

[2] The court notes that there is no decision by the First Circuit Court of Appeals applying subsections (b) and (c) of Section 1113.The only decision by the First Circuit Court of Appeals deals with subsection (e). See United Food & Commercial Workers Union, Local 328, AFL-CIO v. Almac's Inc., 90 F.3d 1, 2 (1st Cir. 1996).

instance. The burden of production lies upon the union as to requirements (5), (7), and (8).") (citations omitted).

### C. Application of Nine Factor Test

*1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.*

Section 1113(b)(1)(A) requires that the debtor must make a proposal to the union subsequent to filing a petition and prior to filing the motion seeking to reject the collective bargaining agreement. See 11 U.S.C. §1113(b)(1)(A). The Debtor's bankruptcy petition was filed on September 28, 2016. The Debtor's first proposal to the Union was made on December 2016. See Joint Exhibits 3 and 4. In addition, the *Motion Requesting Rejection of Collective Bargaining Agreement with Union de Tronquistas* was filed on May 2, 2017. The Union does not contest the Debtor's compliance with this factor. Accordingly, the court finds that this requirement has been met by the Debtor.

However, the December 2016 proposal was not the only proposal sent by the Debtor to the Union. Several proposals were made after negotiations between the parties began. The final proposal is summarized in Joint Exhibit 20 and was made on or around March 2017. See Joint Exhibits 7, 9 and 20. Thus, it was made prior to filing of the motion to reject and commencement of the hearing. Accordingly, the proposal which this court will proceed to consider is the final proposal, as summarized in Joint Exhibit 20. See In re Patriot Coal Corp., 493 B.R. at 113 ("Sections 1113 and 1114 of the Bankruptcy Code contemplate that the Court will consider proposals up and until the commencement of the hearing.). This is so as "[i]t seems clear that the court is not confined to the trustee's original proposal but its allowed to consider the sufficiency

of the last offer by the trustee before commencement of the hearing on the motion to reject the collective bargaining agreement." 7 Collier on Bankruptcy ¶1113.04[1][a].

### 2. *The proposal must be based on the most complete and reliable information available at the time of the proposal.*

As previously discussed, Debtor's proposal must be based on the "most complete and reliable information available at the time of the proposal." 11 U.S.C. §1113(b)(1)(A). "Clearly, the statute's idea is that a debtor-employer must make a proposal firmly grounded in the historical reality of operational economics, an unvarnished evaluation of its current straits, and a thorough analysis of all of the incidents of income and expense that would bear on its ability to maintain a going concern in the future, whether subject to the financial obligations of its collective bargaining agreement(s) or not." In re Mesaba Aviation, Inc., 341 B.R. 693, 712–13 (Bankr. D. Minn. 2006), reversed on other grounds, 350 BR 435 (D. Minn. 2006).

The Debtor's final proposal contains an estimate of the economic impact of each clause the Debtor is seeking to modify. These estimates were calculated by CPA Doris Barroso Vicens based on information provided by the Debtor.  The Union argues that the Debtor did not satisfy this factor because the "debtor provided the dollar amounts of the alleged economic impact to the proposed changes, but [t]he Union had no access to financial data that backups the debtor's numbers. Docket No. 154, p, 8, ¶29. The Union's argument goes to the fifth factor not the second.

Several courts have noted that the second and fifth factor are related. The fifth factor requires that the Debtor provide to the union "such relevant information as is necessary to evaluate the proposal." 11 U.S.C. §1113(b)(1)(B). However, "[t]he second and fifth requirements differ in that the second requirement dictates that the proposal be based on certain information while the fifth requirement dictates that a debtor disclose the necessary information to the union." In re

-10-

Patriot Coal Corp., 493 B.R. at 114.

Furthermore, although the Union disagreed with the quarter chosen by CPA Barroso to calculate the economic impact of several clauses, it failed to present any counter-evidence. As a result, the court concludes that the Debtor complied with the second requirement.

   3. *The proposed modifications must be necessary to permit the reorganization of the debtor*

*Definition of "Necessary"*

The third factor requires that the Debtor's proposal provide for "those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor." 11 U.S.C. §1113(b)(1)(A). This requirement is one of the most important, and there is a lack of consensus among the courts in its interpretation. There is currently a circuit split on the interpretation of this requirement. The Third Circuit Court of Appeals in Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am., AFL-CIO-CLC, 791 F.2d 1074, 1088 (3d Cir. 1986), adopted a standard that has been considered the more strict approach. The Third Circuit held that that the congressional consensus as evidenced by several congressmen's remarks during consideration of Section 1113 "requires that "necessity" be construed strictly to signify only modifications that the trustee is constrained to accept because they are directly related to the Company's financial condition and its reorganization." Id. The Third Circuit further concluded that "it appears from the legislators' remarks that they placed the emphasis in determining whether and what modifications should be made to a negotiated collective bargaining agreement on the somewhat shorter term goal of preventing the debtor's liquidation." Id. at 1089. In addition, the Third Circuit found that the word "necessary" in Section 1113(b)(1)(A) and "essential" in subsection (e) are synonymous. Id. at 1088.

In contrast, the Second Circuit Court of Appeals in Truck Drivers Local 807, Int'l Bhd. of

-11-

Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Carey Transp. Inc., 816 F.2d 82, 90 (2d Cir. 1987), adopted a more "flexible" interpretation. The Second Circuit held that "the necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successful." Truck Drivers Local 807, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Carey Transp. Inc., 816 F.2d at 90. The Second Circuit disagreed with the Third Court's interpretation of the legislative history declaring that "Congress' ultimate choice of this substitute clause suggests that it was uncomfortable with language suggesting that a debtor must prove that its initial post-petition proposal contained only bare-minimum changes." Id. at 89. In addition, the Second Circuit concluded that "necessary" should not be equated with "essential". The Court found that since Section 1113 requires that the Debtor continue to negotiate with the Union in good faith "requiring the debtor to propose bare-minimum modifications at the outset would make it virtually impossible for the debtor to meet its other statutory obligations." Id.

As one court has noted that "the *Carey Transp.* standard appears to have taken a majority among subsequent published decisions." In re Mesaba Aviation, Inc., 341 B.R. at 731 (citations omitted); see also In re Mile Hi Metal Sys., Inc., 899 F.2d 887, 892 (10th Cir. 1990) ("However, the majority of cases decided since *Wheeling–Pittsburgh* have declined to interpret section 1113(b)(1)(A) as requiring that a proposal be absolutely necessary."). The First Circuit Court of Appeals has not rendered a decision interpreting the "necessary" requirement in Section 1113(b)(1)(A). However, it has stated in dicta that "[b]ecause a plan of reorganization may not be confirmed if it is likely to be followed by liquidation or the "need for further financial reorganization," *id.* § 1129(a)(11), the modifications are proposed with a view to the long-run success of the debtor's business." United Food & Commercial Workers Union, Local 328, AFL-

CIO v. Almac's Inc., 90 F.3d at 6.

The court agrees with and adopts the more flexible definition of "necessary" first articulated in Carey. This interpretation reflects the context in which Section 1113 operates and the goals of Chapter 11. Ass'n of Flight Attendants-CWA, AFL-CIO v. Mesaba Aviation, Inc., 350 B.R. at 435 ("The *Carey* interpretation provides the more accurate reading of Section 1113 in its context as part of the larger bankruptcy statute aimed at "providing for the long-term rehabilitation of distressed businesses.") (citations omitted).

The definition of "necessary" is not the only subject on which courts disagree. "There is disagreement among the courts as to whether the necessity of the modifications proposed by the debtor in possession should be addressed on an item-by-item basis or in the aggregate." 7 Collier on Bankruptcy ¶1113.05[3][d] (16th ed. 2015); In re Royal Composing Room, Inc., 848 F.2d 345, 348 (2d Cir. 1988) (holding that "at least in these circumstances, the focus should be on the proposal as a whole."). The court once again agrees with the Second Circuit's reasoning and will focus on the proposal as a whole. See In re Northwest Airlines Corp., 346 B.R. 307, 321 (Bankr. S.D.N.Y. 2006) ("As the Court reasoned in *Royal Composing Room,* requiring that each element of a proposal be necessary would allow a union to defeat a rejection application by singling out an element as unnecessary where it could be reasonably substituted with an alternative.").

*Evidence of Necessity and Economic Value of Modifications*

"To determine whether changes are necessary for a successful reorganization, the court must "look[ ] into the debtor's ultimate future and estimat[e] what the debtor needs to attain financial health." In re Pinnacle Airlines Corp., 483 B.R. 381, 406–07 (Bankr. S.D.N.Y. 2012), as corrected (Nov. 29, 2012), quoting Carey Transportation, 816 F.2d at 89. "The current and projected financial condition of the debtor's business will provide the primary evidence as to whether the trustee's proposed modifications are "necessary" for reorganization, but the facts and

-13-

circumstances of each case may also influence the outcome." 7 <u>Collier on Bankruptcy</u> ¶1113.05[3][c]. Thus, "probative evidence necessarily will involve projections about the future business prospects and financial performance of the debtor's business." <u>Id.</u>

In addition, "[t]o be necessary" a trustee's proposed modifications must have economic value or some other demonstrable impact on the debtor's business." 7 <u>Collier on Bankruptcy</u> ¶1113.05[3][b]. However, "necessary modifications are not limited to changes in wages, but can also include non-economic modifications to the collective bargaining agreement that have a significant economic impact on the debtor's financial operations." <u>In re AMR Corp.</u>, 477 B.R. at 408 (citations omitted). "Courts have frequently held that non-economic modifications that have a significant economic impact on the debtor's financial operations can be necessary to the debtor's reorganization." <u>In re Northwest Airlines Corp.</u>, 346 B.R. 307 at 322 (collecting case law). Thus, "the debtor may not overreach under the guise of proposing necessary modifications. The proposals must be more than potentially helpful; they must be directly related to the debtor's financial condition." <u>In re Mile Hi Metal Sys., Inc.</u>, 899 F.2d at 893 (citations omitted).

The Union sustains that the Debtor's original proposal contained several modifications and that the majority were to non-economic clauses. However, these were later withdrawn. <u>See</u> <u>In re Bowen Enterprises, Inc.</u>, 196 B.R at 743 ("Although debtor initially did include some thirty proposed modifications that arguably conferred no economic benefit upon it, every such proposed modification to which the union objected eventually was withdrawn. We see no good reason why compliance with § 1113(b)(1)(A) should preclude a debtor from initially proposing such modifications in an attempt to reach a comprehensive agreement that encompasses a variety of concerns."). As previously discussed, the court will focus on the final proposal made by the Debtor.

*Necessity of Debtor's Proposal*

The Debtor's final proposal as summarized in Joint Exhibit 20 includes eight modifications. The alleged economic impact of these modifications is contained in Exhibit 21. The Debtor proposed the following modifications:

(1) Article XV Part-time Employees: The Debtor proposes to be able to use part time employees outside the specified workday on Saturdays.  The alleged economic impact of this clause is $90, 412 per year.

(2) Article XVI Temporary Employees: The Debtor proposes to cover the vacation and sick leaves of union employees with temporary employees to limit the payment of time and a half, the union employees' pay rate, to the base rate of temporary employees. The alleged economic impact of this clause is $165, 284 per year.

(3) Article XVIII Strikes and Shutdowns: Include pickets in surroundings for events requiring resolution under the Complaint and Grievance Procedure. The alleged economic impact of this clause is $29,550.82 per day[3].

(4) Article XXI Section 6- Payment for Reporting to Work: Partial Shutdown: The debtor proposes that this be deducted from vacation leave. The alleged economic impact of this clause is $8,666 per year.

(5) Article XXI Section 7- Payment for Closing Operations: Complete Shutdown: The Debtor proposes that this be deducted from vacation leave. The alleged economic impact of this clause is $33,247 per year.

(6) Article XXIX Christmas Bonus: The Debtor proposes to pay a fixed bonus of $600 as long as the Debtor is not exempted by the Labor Department, in accordance with the law. The alleged economic impact of this clause is $117,000 per year.

(7) Article XXX Wages and Other Forms of Compensation: Mileage (including gasoline)- The Debtor proposes to maintain the current fixed payment of $.42 per mile, with no additional adjustment. The alleged economic impact of this clause is $16,800 per year.

(8) Article XXXV Health Insurance Plan: The Debtor proposes to pay 37% of the monthly premium of regular employees who have passed their probationary period and are on the Company's active payroll as the time of the contribution, except for the exceptions included in the CBA. The alleged economic impact of this clause is $159, 859.52.

---

[3] The court notes that the calculation of this amount is not included in Exhibit 21 and the cost is not included in the *Joint Disclosure Statement and Plan.*

-15-

The total economic impact (which does not include impact of pickets) is $582,503 per year. See Exhibit 21. The court notes that some of the clauses included in the Debtor's proposal do not relate to wages and benefits. Notwithstanding, the court finds that they have a significant economic impact on the debtor's operation.

In addition, during the two-day hearing the Debtor presented, through the testimony of its expert witness CPA Barroso, the following evidence: forecasted statements of cash flows including cost of CBA as is (Joint Exhibit 10), forecasted statement of cash flows including proposed modifications to CBA (Joint Exhibit 12), updated forecasted statements of cash flows based on information up until the September 2017 (Joint Exhibit 23 and Debtor's Exhibit 22). CPA Barroso declared that in her expert opinion the Debtor cannot afford the cost of the CBA and will not be able to reorganize if it is not modified. The Union made several allegations related to the Debtor's financial condition but did not present any evidence to contradict the Debtor's evidence regarding the impact of the proposed modifications to the CBA on the cash flows.

The forecasted statements of cash flows, both the original versions, and the updated versions, show that the Debtor cannot afford the cost of the CBA as is. The Debtor would have a negative ending cash balance during the first year of the *Joint Plan of Reorganization* if the CBA is not modified. See Joint Exhibits 10, 12 and Debtor's Exhibit 22. Such negative cash balance will critically affect the feasibility of the *Joint Plan of Reorganization*.

The court finds that the proposed modifications are necessary based on the uncontroverted evidence provided by the Debtor and the testimony of expert witness CPA Barroso[4].

---

[4] Although this court adopts the more "flexible" interpretation of necessary first articulated in Carey, the uncontroverted evidence before the court shows that the Debtor would be unable to reorganize if the CBA is not rejected. If the Debtor is unable to reorganize, liquidation will likely follow. Therefore, the proposed modifications seemingly satisfy the stricter interpretation of necessary followed by the Third Circuit. See In re Trump Entm't Resorts, Inc., 519 B.R. 76, 89 (Bankr. D. Del. 2014), *aff'd sub nom* In re Trump Entm't Resorts, 810 F.3d 161 (3d Cir. 2016) ("The only alternative before the Court to liquidation is the Proposal

*4.   The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.*

The fourth factor requires that all parties are treated fairly and equitably under the proposed modifications. "The purpose of this requirement is to "spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree." 7 Collier on Bankruptcy ¶1113.05[4][a]. "Courts take a flexible approach in considering what constitutes fair and equitable treatment due to the difficulty in comparing the differing sacrifices of the parties in interest." In re AMR Corp., 477 B.R. at 384 (citations omitted).  As part of this consideration, "[c]ourts consider whether concessions have been made by suppliers, creditors, state and local taxing agencies, and management and nonunion employees." 7 Collier on Bankruptcy ¶1113.05[4][a].

The Union submits that the Debtor's proposals are not fair and equitable. However, the evidence presented to the court shows that several creditor classes, Classes 10, 11, and 12 are being paid 10% of their allowed claims. See Joint Exhibit 17. Class 10 consists of the allowed general unsecured tax claims of governmental entities. Class 12 consists of all the allowed general unsecured claims for $5,001 or more which includes for example vendors and landlords. In addition, the Debtor's evidence also shows that the it owes approximately $1 million in accounts payables. The Debtor's president also testified that during the period of November 2016 through September 2017 no employees, besides the union employees, have received a salary increase[5]. Further, the evidence presented shows that several of the proposed modifications offer union employees the same conditions/treatment that non-union employees are already subject to.

and therefore the modifications are indeed essential to the Debtors' short-term survival."); In re Bowen Enterprises, Inc., 196 B.R. at 742. ("Unless debtor obtains some relief from the union in the form of economic concessions, it almost assuredly will have to close its doors in the very near future and undergo liquidation.").

[5] This increase of $.25 per hour was required by the CBA.

-17-

The Union also points out that the Debtor failed to include a "snap-back" provision as it requested. A "snap-back" provision restores some or all of the concession required by the proposal in the event that a debtor's financial condition improves. However, the court finds that the failure to include a "snap-back" provision is not fatal to the Debtor's request to reject a collective bargaining agreement pursuant to Section 1113. See In re Trump Entm't Resorts, Inc., 519 B.R. at 90; In re Appletree Markets, Inc., 155 B.R. 431, 440 (S.D. Tex. 1993).

There is no doubt that the Union has made concessions and sacrifices in order to assist the Debtor. However, the evidence shows that other parties in interest are also sharing in this burden. Accordingly, the court finds that the Debtor's proposal is fair and equitable.

5. *The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.*

Section 1113(b)(1)(B) requires that the Debtor provide the Union "with such relevant information as is necessary to evaluate the proposal." 11 U.S.C. §1113(b)(1)(B). "[T]he breadth and depth of the requisite information will vary with the circumstances, including the size and complicacy of the debtor's business and work force; the complexity of the wage and benefit structure under the collective bargaining agreement; and the extent and severity of modifications that the debtor is proposing." In re Mesaba Aviation, Inc., 341 B.R at 714.

The Union adamantly disputes that it has been provided with sufficient information to allow it to evaluate the Debtor's proposal. The record reflects that the Debtor produced the following information to the Union: (i) income tax returns for the year 2014 and 2015 for all three debtor corporations; (ii) cash flow statements and financial statements for the years 2014 and 2015; (iii) information regarding intercompany transfers for the year 2017 as reflected in monthly operating reports; (iv) list of Debtor's non-union employees of the and their positions for the years 2015, 2016 and 2017; (v) list of salaries of Debtor's managerial positions, including stockholders

-18-

for the years 2015, 2016 and 2017; and (vi) detail regarding calculation of economic impact of proposals calculated by CPA Barroso. See Docket No. 213. The Debtor also provided ten year forecasted statements of cash flows with the cost of the CBA as is and with the proposed modifications. See Joint Exhibits 10 and 12. In addition, as previously discussed, the Debtor provided updated forecasted statements of cash flows based on information up to September 2017. See Debtor's Exhibit 22 and Joint Exhibit 23. This updated information was produced one day prior to the hearing.

Nevertheless, the Union argues that this is not enough. The Union requested information that was not produced. This led to a discovery dispute which the court resolved before commencement of the evidentiary hearing in favor of the Debtor based on the expediency, time limitations contained in Section 1113 and the time that had elapsed. See *Minute Entries*, Docket Nos. 231 and 232, and *Audio File* Docket Nos. 228 and 229. The Union requested client lists and copies of all the client's contracts. In addition, the Union also requested lists of the salaries and managerial positions for the other two debtor corporations. The Union also requested the cash flow statements for the fiscal year ending in May 31, 2017 and the 2016 tax returns. The Debtor objected to these requested declaring that the information has either not been prepared or is irrelevant and/or protected as a trade secret.

The Debtor's yearly revenue is approximately $10-15 million. This is not to say that the stakes are not high for both the Union and the Debtor. However, this is not a complex or large business of the kind that other courts have had before them such as airline or coal mining companies. The breadth and depth of the information required in those cases is not the same as the information required in a case like this.

Based on the above and the particular circumstances in this case, the court finds that the Debtor has provided the Union the necessary information for them to evaluate the proposal.

-19-

6. *Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.*

The court will not expand on this requirement as the record reflects Debtor's compliance with the same and the Union agrees that this requirement has been satisfied. See Docket No. 154, p. 19, ¶63.

7. *At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.*

Section 1113(b)(2) not only requires that the Debtor meet with the Union, it requires that it confer in "good faith" to try to reach an agreement. 11 U.S.C. §1113(b)(2). Moreover, as previously discussed "[o]nce the debtor has shown that it has met with the union representatives, it is incumbent upon the union to produce evidence that the debtor did not confer in good faith." In re 710 Long Ridge Rd. Operating Co., II, LLC, 518 B.R. 810, 839 (Bankr. D.N.J. 2014), quoting In re Am. Provision Co., 44 B.R. at 910. "Generally, the requirement is satisfied when the trustee has seriously attempted to negotiate reasonable modifications in the existing agreement before the rejection hearing." 7 Collier on Bankruptcy ¶1113.05[5].

The Union sustains that the Debtor has not satisfied this requirement. It argues that evidence of the Debtor's bad faith includes its failure to consider proposals by the Union and its filing of the bankruptcy petition one month after negotiating the CBA in August. The court has already ruled that the Debtor provided sufficient information to allow the Union to evaluate the proposals. In addition, although the sequence of events in this case is unfortunate, the fact that the Debtor filed for bankruptcy one month after negotiating the CBA cannot lead to the conclusion that it acted in bad faith. Section 1113 gives the Debtor the right to file for rejection once a bankruptcy petition is filed under Chapter 11. Additionally, the evidence before the court shows the Debtor was engaged in negotiations with its landlord to try to reach an agreement as to a $2.9

-20-

million-dollar debt prior to filing the bankruptcy petition. However, this agreement never materialized and was part of the reason why the Debtor filed for bankruptcy. The Debtor's President testified that the 2016 CBA was negotiated on the assumption that the agreement with the landlord would be executed. See *Minute Entry*, Docket No. 231, and *Audio File* Docket No. 228.

Furthermore, the evidence presented during the evidentiary hearing showed that the Debtor reviewed the health insurance quotes sent by the Union and found that they were more expensive and provided less coverage than the current health insurance plan. The record also reflects that the Debtor withdrew several modifications contained in the original proposals. Moreover, although the Union engaged in negotiations with the Debtor and submitted alternatives, it never submitted a counter-proposal to the Debtor.

The Union also sustains that the Debtor committed an unfair labor practice by holding a meeting with union employees without inviting a representative from the Union. The evidence showed that the Debtor held a meeting in which union and non-union employees were present in which the health insurance coverage and Christmas bonus were discussed. The Debtor did not invite a Union representative to be present. The Debtor argued that this was a lawful "informative" meeting.

The court need not decide whether the meeting was lawful or unlawful. It is clear that the tensions between the parties affected negotiations between them. However, the evidence before the court shows that the Debtor was willing to negotiate with the Union to try to reach an agreement.

8. *The Union must have refused to accept the proposal without good cause.*

-21-

Section 1113 also imposes obligations on the Union. Section 1113(c)(2) authorizes rejection of a collective bargaining agreement when the union "has refused to accept such proposal without good cause." 11 U.S.C.§1113(c)(2). As one Court has explained:

> "Ultimately, when making a "Good Cause" determination, a court will consider the parties' respective positions and conduct; the proposal that was rejected; and the context in which it was rejected—all, as *Maxwell Newspapers* put it, as part of the "moorings of a given case"—to determine, for example, whether the union's decision to reject the debtor's proposal was out of intransigence or unwillingness to recognize economic realties, on the one hand, or by reason of statutory or economic deficiencies in the debtor's proposal (or inappropriate debtor negotiating conduct), on the other."

In re Pinnacle Airlines Corp., 483 B.R at 381, quoting In re Maxwell Newspapers, Inc., 981 F.2d 85, 90 (2d Cir.1992). Moreover, "[a]lthough the debtor has the ultimate burden of persuasion on the matter, the union is required to supply "its reason for declining to accept the debtor's proposal in whole or in part." In re 710 Long Ridge Rd. Operating Co., II, LLC, 518 B.R. at 837, quoting Carey Transp., 816 F.2d at 92.

The Union refused to accept the Debtor's proposal. Although the record reflects that the Union engaged in negotiations with the Debtor, the evidence before the court shows that it is unlikely that the Union would have been willing to accept any proposal from the Debtor. Lucas Alturet, a Union service representative, testified that the Union rejected the proposal because it understood it had already negotiated and made substantial concessions in August 2016. See *Minute Entries*, Docket Nos. 231 and 232, and *Audio File* Docket Nos. 228 and 229. This is further evidenced by the fact that the Union never made a counter-proposal to the Debtor.

The court does not dispute that the Union made substantial concessions or minimize the same. However, the Union could not refuse to compromise once the Debtor filed for bankruptcy and invoked its rights under Section 1113. Thus, the court concludes that the Union did not have "good cause" to reject the proposal. In re Royal Composing Room, Inc., 848 F.2d at 349 ("If, on

-22-

the other hand, the union refuses to compromise, it is as unlikely it could be found to have acted with good cause."); see also In re N.W. Holding Co., 533 B.R. 753, 762 (Bankr. E.D. Mo. 2015) ("Negotiation is a two way street; if the unions wish to show that they rejected the proposals with good cause, they must show that they were willing to leave something on the bargaining table as well.").

9. *The balance of the equities must clearly favor rejection of the collective bargaining agreement.*

The final factor requires that the "balance of equities" clearly favor rejection. 11 U.S.C. §1113(c)(3). This subsection codifies the test articulated by the Supreme Court in Bildisco. The Supreme court held that in balancing the equities "the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization." N.L.R.B. v. Bildisco & Bildisco, 465 U.S. at 527.

The Second Circuit has articulated a non-exhaustive list of factors which a court must consider in determining whether the "balance of equities" favors rejections. The factors are:

(1) the likelihood and consequences of liquidation if rejection is not permitted;
(2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force;
(3) the likelihood and consequences of a strike if the bargaining agreement is voided;
 (4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved;
(5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and
(6) the good or bad faith of the parties in dealing with the debtor's financial dilemma.

In re AMR Corp., 477 B.R. at 448–49. After considering the above factors in light of this court's findings as discussed above, the court concludes that the balance of the equities in this case favors

-23-

rejection. The court has already found that the burden is spread among parties in interest and that the Debtor negotiated in good faith. The evidence before the court shows that the Debtor will not be able to successfully reorganize if rejection is not permitted. Thus, the Debtor has satisfied this requirement.

As one court has noted, "labor costs must sometimes be reduced for successful reorganization even if they are not to blame for the debtor's plight." In re Indiana Grocery Co., Inc., 138 B.R. 40, 47 (Bankr. S.D. Ind. 1990).

Based on the evidence before it, the court hereby finds that the Debtor has satisfied the requirements of Section 1113. Therefore, the Debtor's *Motion Requesting Rejection of Collective Bargaining Agreement with Union de Tronquistas* (Docket No. 152) is hereby granted.

## Conclusion

The court finds, based on the evidence before it, that the Debtor has complied with Section 1113's requirements. The Debtor has shown that it satisfied the nine-factor test. Accordingly, Debtor's *Motion Requesting Rejection of Collective Bargaining Agreement with Union de Tronquistas* (Docket No. 152) is hereby granted.

SO ORDERED.

In San Juan, Puerto Rico, this 7th day of December, 2017.

Enrique S. Lamoutte
United States Bankruptcy Judge

-24-